# UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA
***

| | |
|---|---|
| NML CAPITAL, LTD., | |
|                Plaintiff, | |
| vs. | Lead Case No. 2:14–cv–492–RFB–VCF |
| THE REPUBLIC OF ARGENTINA, | Member Case No. No. 2:14–cv–1573–RFB–VCF |
|                Defendant. | **<u>ORDER</u>** |

This matter involves NML Capital, Ltd.'s postjudgment execution proceeding against the Republic of Argentina. Four motions are before the court: Non-Party M.F. Corporate Services' Motion to Quash (#14[1]), NML's Counter Motion to Compel (#60), Non-Party Val de Loire's Motion to Quash (#1), and NML's Counter Motion to Compel (#10). For the reasons stated below, the parties' motions are granted in part and denied in part.

## BACKGROUND

In 2001, the Republic of Argentina suffered a depression and sovereign-default crisis. The majority of Argentina's bondholders voluntarily restructured their investments and took a 70% loss. One bondholder refused: NML Capital Ltd. ("NML"). Beginning in 2003, NML commenced eleven collection actions against Argentina in the Southern District of New York. NML argued that its debt—which totals $1.7 billion—should be repaid in full. The court agreed. *See EM Ltd. v. Republic of Argentina*, 695 F.3d 201, 203 n.1 (2d Cir. 2012) *aff'd  Republic of Argentina v. NML Capital, Ltd.*, 134 S. Ct. 2250, 2251 (2014).

---

[1] Parenthetical citations refer to the court's docket.

To date, Argentina has failed to satisfy NML's judgments. *See, e.g.*, *NML Capital, Ltd. v. Banco Cent. de la Republica Argentina*, 652 F.3d 172, 196 (2d Cir. 2011). This has caused NML to travel the globe in search of property owned by Argentina, which NML may attach to execute its judgments. This search brought NML to Las Vegas, Nevada.

NML suspects that former Argentine President Néstor Kirchner and his wife, current President Cristina Fernández de Kirchner, awarded lucrative state-controlled projects to two political insiders, Lázaro Báez and Cristobal López, who embezzled billions of pesos in state funds and laundered the proceeds through Nevada. Because a "thief acquires no title to the property which he steals," *Robinson v. Goldfield Merger Mines Co.*, 206 P. 399, 401 (Nev. 1922); Código Penal art. 23, 303 (Arg.), NML commenced this proceeding against Nevada entities that are allegedly controlled by Báez and López and implicated in laundering embezzled assets. The circumstances surrounding the alleged theft are discussed below.

I.      **<u>The Allegations against Lázaro Báez</u>**

In April of 2013, an Argentine journalist named Jorge Lanata initiated an investigation dubbed *La Ruta Del Dinero K* (i.e., "the K Money Trail") into the Kirchners, Báez, and the trio's financial dealings. All three allegedly embezzled billions of pesos from public-infrastructure projects and laundered the proceeds and other embezzled funds through various international shell corporations.

The scheme was allegedly executed in two steps. Weeks before Nestor Kirchner was elected in 2003, Báez founded Austral Construcciones S.A., a construction company that was awarded public-works contracts in Patagonia. In exchange for these lucrative contracts, Báez allegedly funneled a portion of the public funds back to the Kirchners through Báez's hotel-management company, Valle Mitre S.A. ("Valle Mitre"). Valle Mitre guaranteed that hotels owned by the Kirchners would, on paper, appear at least one-third occupied throughout the year.

These allegations culminated in an official criminal investigation. The lead prosecutor, José María Campagnoli, reported that Báez laundered $65 million in embezzled state funds through Panama and 150 corporations in Nevada. Campagnoli's report also stated that all 150 Nevada corporations have the same domicile, Las Vegas, Nevada, and the same director, Aldyne, Ltd., a Seychellois corporation. After submitting the report to Argentina's National Supreme Court of Justice, the Kirchner government retaliated and removed Campagnoli from office.

On August 13, 2013, NML subpoenaed 123 corporations in Las Vegas. It argued that there is reasonable suspicion to believe that the 123 corporations ("the Báez Entities") are the same 150 corporations referred to in Campagnoli's report. The court agreed for several reasons. *See NML Capital Ltd. v. Republic of Argentina*, No. 14–cv–492–RFB–VCF, 2014 WL 3898021 (D. Nev. Aug. 11, 2014).

First, each of the Báez Entities has the same registered agent, M.F. Corporate Services (Nevada), Ltd. ("M.F. Corporate Services" or "MF Nevada"). M.F. Corporate Services is a Nevada corporation with one employee, Patricia Amunategui, one client, the Panamanian law firm, Mossack Fonseca & Co., and one owner, Tornbell Associates, Inc. ("Tornbell"). Tornbell is also a Panamanian company. Its agent is Mossack Fonseca & Co. and its directors are all Mossack Fonseca & Co. employees.

M.F. Corporate Services claims to be Mossack Fonseca & Co.'s Nevada-based independent contractor, used in connection with the law firm's company-formation practice. This practice provides clients with the opportunity to form corporate entities in various jurisdictions worldwide to reduce their client's tax and regulatory exposure. Mossack Fonseca & Co. is known for incorporating shell companies and laundering money.[2]

---

[2] *See Shells and Shelves*, THE ECONOMIST, April 7, 2012, available at: http://www.economist.com/node/21552196; Ken Silverstein, *The Law Firm That Works with Oligarchs, Money Launderers, and Dictators*, VICE, Dec. 13, 2014, available at: http://www.vice.com/read/evil-llc-0000524-v21n12. These are referenced for background purposes only. *Von Saher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954, 960 (9th Cir. 2010) ("Courts may take

3

Second, in response to NML's subpoenas, M.F. Corporate Services produced mirror image operating agreements for seventeen of the Báez Entities. The operating agreements identified M.F. Corporate Services as the registered agent and Aldyne, Ltd., Gairns Ltd., or both as the corporations' member and director. The addresses for Aldyne and Gairns are identical: Suite 13, First Floor, Oliaji Trade Centre, Francis Rachel Street, Victoria, Mahe, Republic of Seychelles. This address is also shared by Mossack Fonseca & Co.

Third, when NML subpoenaed the Báez Entities, a single individual, Letcia Montoya, spoke on behalf of each entity. Montoya is one of Aldyne, Ltd.'s corporate officers, the custodian of records for most of the Báez Entities, and an attorney with or employee of Mossack Fonseca & Co. Montoya asserted that none of the Báez Entities possess responsive documents—including their own operating agreements—and that none of the Báez Entities reside in or regularly conduct business within 100 miles of Las Vegas. Writing on behalf of Aldyne and Gairns, Montoya later asserted that neither Aldyne nor Gairns are "actually owned by anybody." (Montoya Letters (#83) at Ex. N & O).

## II.   The Allegations against Cristobal López

The allegations against López parallel the allegations against Báez. Argentine prosecutors and journalists claim that López improperly acquired lucrative hydrocarbon and gambling concessions from the Kirchner government, which the trio used to defraud the Argentine people and enrich themselves. A web of corporations are implicated in the López scheme: Casino Club, S.A., Hipódromo de Palermo, S.A. ("Hipódromo"), Correón, S.A., Centenary International Corp., and Val de Loire.

Shortly after Néstor Kirchner was elected in 2003, two of López's companies, Hipódromo and Casino Club, allegedly experienced considerable "economic expansion" and "exorbitant profits."

---

judicial notice of publications introduced to 'indicate what was in the public realm at the time, not whether the contents of those articles were in fact true.'").

Hipódromo operates a thoroughbred racetrack in the province of San Isidro. It is part of a joint venture with Casino Club, which owns and operates a chain of casinos and slot machine parlors. Judges Rodolfo Canicoba Corrál and Julián Ercolini commenced investigations into Hipódromo and Casino Club for tax evasion, defrauding the government, and colluding with the Kirchners. They allege, *inter alia*, that López rigged the slot machines to conceal revenue and evade taxes.

Like Báez, López may have also laundered his ill-gotten gains through Nevada corporations. Documents produced in connection with NML's postjudgment proceedings and Argentina's criminal investigations link Hipódromo and Casino Club to another López entity, Val de Loire. Val de Loire is a Nevada company. Its registered agent is M.F. Corporate Services and its manager and authorized representative is a Mossack Fonseca & Co. affiliate, Edmund Ward. Documents obtained by NML memorialize transactions between Val de Loire, Hipódromo, and two Báez Entities, Fintech Holdings and Balmont Holdings.

When NML subpoenaed Val de Loire, Ward submitted an affidavit that parrots the affidavits Montoya executed on behalf of the Báez Entities. Ward contends that no responsive documents exist, Val de Loire never conducted business with Báez, López, or their companies, and Val de Loire has no employees who reside in or regularly conduct business within 100 miles of Las Vegas.

### III.   The allegations against M.F. Corporate Services

On September 11, 2014, NML deposed M.F. Corporate Services' sole employee, Patricia Amunategui. She explained that M.F. Corporate Services assists Mossack Fonseca & Co. with its company-formation practice. M.F. Corporate Services creates "on the shelf" corporations that are "ready to go" for Mossack Fonseca & Co.'s clients. She stated that "sometimes [Mossack Fonseca & Co.'s clients] need [a] company in less than 24 hours" and cannot wait "for the Secretary of State to get [the company] incorporated." (Depo. (#90-1) at 109:17–19).

5

Ms. Amunategui's job involves processing paperwork and preparing "corporate kits." She assembles articles of organization and related documents required for processing by the Secretary of State. After the Secretary of States processes and returns the paperwork that Ms. Amunategui assembled, she sends the documents to one of Mossack Fonseca & Co.'s offices. Mossack Fonseca & Co. then "prepare[s] the rest of the corporate kit to give it to [their client.]" (*Id*. at 131:8–17).

Ms. Amunategui also testified that (1) Mossack Fonseca & Co. is M.F. Corporate Services' only client; (2) her employment contract with M.F. Corporate Services was signed by Messrs. Jurgen Mossack and Ramón Fonseca of Mossack Fonseca & Co.; (3) the operative agreement between M.F. Corporate Services and Mossack Fonseca & Co. prohibits M.F. Corporate Services from doing business with other clients absent prior approval by Mossack Fonseca & Co., and (4) Mossack Fonseca & Co. provides M.F. Corporate Services with human-resources and information-technology services.

Ms. Amunategui was asked to interpret the following two provisions from her employment contract with M.F. Corporate Services: (1) "The employer shall direct and control all of the details of the employee's work and the employee shall report, with respect to her work assignments, to the employer" and (2) "It is understood that the employee shall have all of her communication solely with the employer and its representatives." (*Id*. at 53:5–9, 57:7–10). Ms. Amunategui stated that although her employer is M.F. Corporate Services, she receives all of her directions from Iris Vergara in Mossack Fonseca & Co.'s sales department or another sales representative. (*Id*. at 55:24, 58:1–6). Ms. Amunategui also indicated that she regards Ms. Vergara as M.F. Corporate Services' representative, even though she is an employee of Mossack Fonseca & Co. who lives and works in Panama.

Mossack Fonseca & Co.'s website advertises Nevada as a jurisdiction in which Mossack Fonseca & Co.'s clients may choose to incorporate. When asked about the website, Ms. Amunategui testified that it refers to the services provided by M.F. Corporate Services. (*See* Amunategui Depo. (#90-1) at 117).

6

Indeed, the website advertises "M.F. Corporate Services (Nevada) Limited" as Mossack Fonseca & Co.[3]

## IV.    **The Discovery Disputes**

These allegations provide the backdrop for the pending discovery disputes, which arise from three subpoenas: (1) the Amunategui Subpoena, (2) the MF Nevada Subpoena, and (3) the Val De Loire Subpoena.

NML served the Amunategui Subpoena (#14-2) on M.F. Corporate Services' Custodian of Records. It seeks, *inter alia*, "[a]ll documents relating to funds or other property transferred either by one of the following entities to another person, or to one of the following [137] entities by another person, since January 1, 2010." (Doc. #14-2 at 9–12). The 137 entities are the 123 Báez Entities and fourteen additional companies: (1) Westley House, LLC, (2) Eyden Group, LLC, (3) RGS Steel LLC, (4) Itelsa Services, LLC, (5) GD Soccer Management LLC, (6) Cambridge House LLC, (7) Exeter House, LLC, (8) Redford House LLC, (9) T.H.I. - Tower House International LLC, (10) M.P.I. - Mayward Properties International LLC, (11) Fairland International LLC, (12) Rochester International LLC, (13) Westfield International LLC, and (14) Ariona Company LLC. (*Compare id. with* Appx. A (#1) at 19–21).[4]

NML served the MF Nevada Subpoena (#14-5) on M.F. Corporate Services as "agent" for Mossack Fonseca & Co. It seeks "All Documents Concerning funds or other property transferred either by one of the following [253 companies] to another Person (including any of the following [253] entities), or to one of the following [253 companies] to another Person (including any of the following [253] entities) since January 1, 2010." (Doc. #14-5 at 10–15). The list of 253 entities includes the 137 entities listed in the Amunategui Subpoena plus an additional 116 entities. The MF Nevada Subpoena also notices

---

[3] *See* Mossack & Fonseca, Company Formation: Nevada, USA, *Features of Jurisdiction*, at 3, http://www.mossackfonseca.com/ wp-content/uploads/2014/11/Nevada_features.pdf (last visited March 13, 2015).
[4] The Amunategui Subpoena also notices Ms. Amunategui's Rule 30(b)(6) deposition. As discussed above, this took place on September 11, 2014.

Mossack Fonseca & Co.'s Rule 30(b)(6) deposition.

The MF Nevada Subpoena also seeks (1) "All Documents Concerning and Communications between You and/or MF (Nevada), or are hard [*sic*], and any of the following [27] Persons," (2) "Documents sufficient" to identify or describe "any and all beneficial owners of," "the business and operations for," and "any and all Persons authorized to give instructions on behalf of" two entities (i.e., Amurnung Sa and Cambridge House LLC), and (3) "All Documents Concerning the relationship between You" and M.F. Corporate Services, Aldyne Ltd., Plascot Ltd., Forbest Limited, and Bugloss Holdings, SA. (*Id*. at ¶ 5 pp. 16–18).

The Val de Loire Subpoena (#1-1) contains sixteen document requests and notices Val De Loire Rule 30(b)(6) deposition. The document requests seek information related to Báez, his family members, and affiliated companies. (*See id*. at p. 15, Attachment C).

Now, M.F. Corporate Services, Ms. Amunategui, and Val De Loire move to quash the subpoenas. They contend that (1) NML has not established a connection between Val de Loire and Argentine assets, (2) NML's subpoena improperly serves M.F. Corporate Services as Mossack Fonseca & Co.'s "agent," and (3) the document requests are unduly burdensome.

### LEGAL STANDARD

"In aid of the judgment or execution, the judgment creditor . . . may obtain discovery from any person—including the judgment debtor—as provided in these rules or by the procedure of the state where the court is located." FED. R. CIV. P. 69(a)(2).

Discovery under Rule 69 is "quite permissive." *Republic of Argentina v. NML Capital, Ltd*., 134 S. Ct. 2250, 2254 (2014). In the federal system, the general rule is that "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense." FED. R. CIV. P. 26(b)(1). In the state system, "[p]arties may obtain discovery regarding any matter, not privileged, which

is relevant to the subject matter involved in the pending action." NEV. R. CIV. P. 26(b)(1).

These provisions provide for "[l]iberal discovery." *Seattle Times, Co. v. Rhinehart*, 467 U.S. 20, 34 (1984). The rules permit a judgment creditor to "fish" for evidence, even among nonparties, provided that the judgment creditor casts a "reasonably calculated" lure. FED. R. CIV. P. 26(b), Advisory Comm. Notes (1946) (citing *Hickman v. Taylor*, 329 U.S. 495, 507 (1947)); *Washoe Cnty. Bd. of School Trustees v. Pirhala*, 435 P.2d 756, 759 (Nev. 1968) (citing *Hickman*, 329 U.S. at 507); *NML Capital*, 134 S.Ct. at 2255 (indicting that foreign nonparties may be examined).

To obtain discovery from a nonparty, a judgment creditor must make a threshold showing. Under federal law, a judgment creditor must show (1) "the necessity and relevance of [the] discovery sought" or (2) that "the relationship between the judgment debtor and the nonparty is sufficient to raise a reasonable doubt about the bona fides of the transfer of assets." 12 C. WRIGHT & A. MILLER, FEDERAL PRACTICE & PROCEDURE § 3014, p. 162 (2d ed.). Under Nevada law, discovery of a nonparty's assets is not permissible "absent special circumstances, which include, but are not limited to, those in which the relationship between the judgment debtor and the nonparty raises reasonable suspicion as to the good faith of asset transfers between the two, or in which the nonparty is the alter ego of the judgment debtor." *Rock Bay, LLC v. Dist. Ct.*, 298 P.3d 441, 443 (Nev. 2013).

### DISCUSSION

The parties' motions raise three questions: (1) whether NML demonstrated reasonable suspicion to obtain discovery from Val de Loire; (2) whether M.F. Corporate Services is Mossack Fonseca & Co.'s alter ego or agent; and (3) whether NML's subpoenas are unduly burdensome. Each is addressed below.

### I.   Whether NML Demonstrated Reasonable Suspicion to Obtain Discovery from Val de Loire

Val de Loire asserts that NML lacks reasonable suspicion to propound discovery on it. The court disagrees. Reasonable suspicion is a low standard. It merely entails "some minimal level of objective

9

justification." *United States v. Sokolow*, 490 U.S. 1, 7 (1989). The court's analysis of Val de Loire's Motion to Quash begins with the Supreme Court's decision in in *Terry v. Ohio*, 392 U.S. 1, 22 (1968), which first articulated this standard.

In *Terry*, the Supreme Court held that reasonable suspicion justifying an intrusion exists if a police officer is "able to point to specific and articulable facts which, taken together with rationale inferences from those facts, reasonably warrant [an] intrusion." *Id*. at 21. When deciding whether this standard is satisfied, "due weight must be given, not to [a police officer's] inchoate and unparticularized suspicion or 'hunch,' but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience." *Id*. at 27; *Walker v. State*, 944 P.2d 762, 770 (Nev. 1997) ("The officer must be able to point to specific and articulable facts which, when taken together with rational inferences from those facts, reasonably warrant intrusion.").

Because the concept of reasonable suspicion is not "readily, or even usefully, reduced to a neat set of legal rules," *Illinois v. Gates*, 462 U.S. 213, 232 (1983), it is useful to examine the circumstances that gave rise to it. In *Terry*, an officer testified that a situation "didn't look right to me at the time" because two individuals repeatedly paced back and forth in front of a store. *Terry*, 392 U.S. at 5–6. The officer testified that he had not received a tip, "[h]e ha[d] never seen the two men before, and he was unable to say precisely what first drew his eye to them." *Id*. But, he "feared 'they may have a gun.'" *Id*. at 6. So, he intervened, frisked one suspect, and discovered a gun. *Id*. The Supreme Court deemed this conduct reasonable. *Id*. at 8.

In *Rock Bay*, the Nevada Supreme Court held that a judgment creditor may not obtain discovery regarding a nonparty's assets "absent special circumstances, which include, but are not limited to, those in which the relationship between the judgment debtor and nonparty raises reasonable suspicion as to the good faith of asset transfers between the two." *Rock Bay*, 298 P.3d at 443. In *Rock Bay*, the judgment

creditor served subpoenas on a nonparty accounting firm and a nonparty bank. *Id*. at 444. The subpoenas "sought all" of the accounting firm's "records related to the judgment debtors" and two associated nonparty companies, including Rock Bay. *Id*. The trial court held that reasonable suspicion existed to examine the Rock Bay's assets because (1) the judgment debtor had reserved Rock Bay's name with the Nevada Secretary of State, (2) there were multiple transfers of money between Rock Bay and the judgment debtors, and (3) Rock Bay was voluntary dissolved after a judgment was registered in Nevada against the judgment debtor. *Id*. at 444, 446. The Nevada Supreme Court deemed this reasonable.

NML's basis for propounding discovery on Val de Loire is equally reasonable. As discussed in the court's previous order, NML demonstrated reasonable suspicion to believe that the Kirchners and Báez are or were in possession of Argentina's assets and that Báez controls entities in Nevada that possess information regarding those assets. *See NML Capital Ltd*., 2014 WL 3898021, at *5–6. Objective information supporting this inference include the Campagnoli Report, which NML corroborated by obtaining discovery from M.F. Corporate Services, the Báez Entities' registered agent. *See id*. NML demonstrated, as Campagnoli alleged, that the Báez Entities are shell corporations with substantial links to two corporations in the Seychelles (i.e., Aldyne, Ltd. and Gairns Ltd) and a Panamanian law firm, Mossack Fonseca & Co., which is known to incorporate shell companies in order to launder their clients' assets. *Id.* at 12.

NML also demonstrated reasonable suspicion to believe that Val de Loire is connected to Báez and controlled by López. Facts supporting this inference include (1) a common registered agent, M.F. Corporate Services, (2) a connection to Mossack Fonseca & Co. through M.F. Corporate Services and Mr. Ward, (3) documents memorializing transactions between Val de Loire and two Báez Entities, Fintech Holdings and Balmont Holdings, and (4) documents indicating that Val de Loire has a 35% stake in Correón, S.A., an Argentinian company that owns two companies controlled by López: Hipódromo and

Casino Club, S.A.

Additionally, NML produced an expert report by Pablo Maggio, which details the status of nine ongoing criminal investigations linking the Kirchners, Báez, López, and their companies for a variety of crimes (e.g., conspiracy, fraud, tax evasion, embezzlement, fraud against the public sector, abuse of authority, and breach of duty by a public official). The court does not regard these facts as true; it merely recognizes that they exceed an "inarticulate" and "inchoate" "hunch," *Terry*, 392 U.S. at 21, as required by Rule 69. *See Rock Bay*, 298 P.3d at 443.

Val de Loire contends that "NML has no grounds" for propounding nonparty discovery on it because "disclosure concerning the assets of a non-party is generally not contemplated by Rule 69(a), (*see* Mot. to Quash (#1) at 4:7–8, "there is not a single request regarding the actual judgment debtor – Argentina," (*id*. at 4:19 –20, 5:24–25), "NML has offered zero evidence linking [Val de Loire] to the actual judgment debtor," (*id*. at 6:5–6), and NML cannot pursue "the low hanging fruit," (*see* Min. Proceedings #99). That is, NML must propound discovery on Argentina before examining Val de Loire. (*Id*.) These arguments fail on the law and facts.

There is no question that a judgment creditor may propound discovery on third parties regarding the judgment debtor's assets or the nonparties' assets. *See* FED. R. CIV. P. 69(a)(2) (stating that discovery may be obtained "from any person"); *NML Capital, Ltd*., 134 S. Ct. at 2255 ("[I]n a run-of-the-mill execution proceeding . . . the district court would have been within its discretion to order the discovery from third-party banks about the judgment debtor's assets."); WRIGHT & MILLER, *supra*, § 3014, pp. 160–61 ("[T]hird persons can be examined"). Postjudgment examination of nonparties is typical where, as here, the judgment debtor's assets were allegedly "fraudulently transferred or are otherwise beyond the reach of execution." *See id*.; *Rock Bay*, 298 P.3d at 443.

Val de Loire's contention that "there is not a single request regarding the actual judgment debtor" is also incorrect. Each document request and subject of examination seeks information related to Báez, López, and their companies. (*See* Subpoena (#1-1) at p. 15, Attachment C). These requests constitute requests regarding the judgment debtor's assets because a "thief acquires no title to the property which he steals," *Robinson*, 206 P. at 401, CÓDIGO PENAL art. 23, 303 (Arg.), and there is reasonable suspicion to believe that the Báez, López, and their companies may be thieves.

Nor is it necessary for NML to present "evidence" linking Val de Loire to Argentina.[5] The standard governing the court's inquiry is whether the relationship between Argentina and Val de Loire raises a "reasonable suspicion" as to the good faith of asset transfers between the two. *Rock Bay*, 298 P.3d at 443. A finding of reasonable suspicion depends on "articulable facts" and "specific reasonable inferences," not evidence or an iron-clad chain of facts. *See Terry* U.S. at 27; *Rock Bay*, 298 P.3d at 443. During warrant proceedings or *Franks* hearings, which are analogous to this proceeding, the Federal Rules of Evidence do not apply. *See* FED. R. EVID. 1101(d). In civil proceedings, a motion to compel similarly does not require an evidentiary hearing.

At oral argument Val de Loire asserted that even if NML presents "articulable facts" that Val de Loire is in possession of Argentine assets, the court cannot conclude that reasonable suspicion exists because *Rock Bay* requires showing a transaction "between the two." That is, Val de Loire contends that a finding of reasonable suspicion depends on the existence of a transaction directly from Argentina to Val de Loire. The court disagrees.

*Rock Bay* does not render a nonparty immune from discovery if a direct transfer with the judgment debtor is not shown. In *Rock Bay*, the judgment creditor subpoenaed a nonparty accounting firm, which

---

[5] *See generally* (Val de Loire's Opp'n (#14) at 2–8, 11–13) (arguing that NML lacks "reasonable suspicion" because NML's allegations contain factual "gaps" and are not supported by evidence).

13

was not alleged to have engaged in any transactions with the judgment debtor. *Rock Bay*, 298 P.3d at 443–444. Limiting postjudgment discovery to direct transfers between the judgment debtor and nonparty would narrow the scope of discoverable information,[6] tending the shield the behavior that postjudgment discovery aims to curb: fraudulent transfers. As stated in *Rock Bay*, "[b]ecause the purpose of post-judgment discovery is to locate the judgment debtor's asserts, discovery of a nonparty's assets is permissible if it will lead to discovery of hidden or concealed assets of the judgment debtor." 298 P.3d at 445.

Federal case law reaches the same conclusion. *NML Capital* contains no language indicating that postjudgment discovery is limited to direct transactions between the judgment debtor and a nonparty. *See* 134 S. Ct. at 2255. The Supreme Court stated that the purpose of postjudgment discovery is to obtain information "about the judgment debtor's assets." *Id*. The Second and Ninth Circuits similarly do not require a direct transaction. *See Coffman v. Cobra Mfg. Co.*, 214 F.2d 489, 493 (9th Cir. 1954) (stating that postjudgment, nonparty discovery exists to determine whether the nonparty "has possession of property belonging to the judgment debtor."); *Aurelius Cap. Master, Ltd. v. Rep. of Argentina*, 589 F. App'x 16, 18 (2d Cir. 2014) (stating that nonparty discovery is appropriate if the nonparty "may possess information about Argentina's assets").

This brings the court to Val de Loire's final argument: that NML cannot pursue "the low hanging fruit" and attempt to examine it before examining Argentina. This argument fails as a matter of law. The scope of discovery under Rule 69 is "quite permissive" and not limited to the judgment debtor. *See NML Capital*, 134 S. Ct. at 2254. The judgment creditor "may obtain discovery from any person," FED. R. CIV. P. 69(a)(2), and regarding "any matter" and that "relevant to the subject matter involved in the pending

---

[6] Nevada Rule of Civil Procedure 26(b)(1) permits broad discovery "regarding any matter" that is "relevant to the subject matter involved in the pending action."

14

action." NEV. R. CIV. P. 26(b)(1). No rule limits the sequence of discovery. Both federal Rule 26(d) and Nevada Rule 26(d) state that the "methods of discovery may be used in any sequence." This means, for instance, that depositions may be taken before interrogatories are served and expert witnesses may be examined before percipient witnesses or parties. It follows that nonparties may be examined before judgment debtors.[7]

## II.   Whether M.F. Corporate Services is Mossack Fonseca & Co.'s Alter Ego or Agent

The parties raise a second issue: whether M.F. Corporate Services is Mossack Fonseca & Co.'s alter ego or agent and, if so, whether NML may subpoena M.F. Corporate Services to obtain discovery from Mossack Fonseca & Co. This requires the court to determine whether it has personal jurisdiction over Mossack Fonseca & Co. *See Gucci Am., Inc. v. Weixing Li*, 768 F.3d 122, 141 & n. 20 (2d Cir. 2014) ("A district court must have personal jurisdiction over a nonparty to compel it to comply with a discovery request under Rule 45."). The court begins with the governing law.

### A.   *Personal Jurisdiction & the Corporate Form*

"Federal courts ordinarily follow state law in determining the bounds of their jurisdiction over persons." *Daimler AG v. Bauman*, 134 S. Ct. 746, 753 (2014) (citing FED. R. CIV. P. 4(k)(1)(A)). Under Nevada's long-arm statute, Nevada state courts may exercise personal jurisdiction "over a party to a civil action on any basis not inconsistent with the constitution of this state or the Constitution of the United States." NEV. REV. STAT. § 14.065(1). Because Nevada's long-arm statute allows the exercise of jurisdiction to the full extent permissible under the U.S. Constitution, the court must determine whether NML's subpoena, which served M.F. Corporate Services as Mossack Fonseca & Co.'s "agent," comports

---

[7] Federal Rule 26(b)(2)(C)(i) and the corresponding Nevada rule permit the court to limit discovery if "the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive." Val de Loire did not assert this rule with regard to this argument.

with the limits imposed by federal due process. *See, e.g.*, *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 464 (1985).

The Supreme Court initially decided that a tribunal's jurisdiction over persons ends at the forum's geographic boarder. *Pennoyer v. Neff*, 95 U.S. 714, 720 (1878). Changes in the technology of transportation and communication altered this territorial approach. *Burnham v. Superior Ct. of Cal., Cnty. of Marin*, 495 U.S. 604, 617 (1990); Fed. R. Civ. P. 45(c)(1), Advisory Comm. Notes (1985). In *International Shoe Co. v. Washington*, 326 U.S. 310 (1945), the Supreme Court held that that "a State may authorize its courts to exercise personal jurisdiction over an out-of-state defendant if the defendant has certain minimum contacts with [the State] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 131 S. Ct. 2846, 2853 (2011) (quoting *Int'l Shoe*, 326 U.S. at 316) (internal quotation marks omitted).

*International Shoe* placed "the relationship among the defendant, the forum, and the litigation" at the heart of the inquiry into personal jurisdiction. *Bauman*, 134 S. Ct. at 754 (citing *Shaffer v. Heitner*, 433 U.S. 186, 204 (1977)). It also "presaged the development of two categories of personal jurisdiction:" (1) specific jurisdiction, under which the in-state activities of the corporate defendant "ha[d] not only been continuous and systematic, but also g[a]ve rise to the liabilities sued on" and (2) general jurisdiction, under which a court may hear any and all claims against a corporation because its affiliations with the State are so continuous and systematic as to render the corporation at home in the forum State. *Bauman*, 134 S. Ct. at 754 (citations omitted).

The distinction between specific and general jurisdiction is particularly important in the corporate context. *See, e.g.*, *Bauman*, 134 S. Ct. at 759 & n. 13. Corporate entities are presumed separate so that the actions of a subsidiary company are generally not attributable to its parent corporation, absent certain exceptions. *Viega GmbH v. Eighth Judicial Dist. Court*, 328 P.3d 1152, 1157 (Nev. 2014) (en banc); 1 W.

16

FLETCHER, CYCLOPEDIA OF THE LAW OF CORPORATIONS § 30, p. 30 (Supp. 2012–2013). Two exceptions are relevant here: agency and alter ego. *See Viega GmbH*, 328 P.3d at 1157, 1162; *see also McDermond v. Siemens*, 607 P.2d 108, 110 (Nev. 1980) (recognizing alter ego); *Dogra v. Liles*, 314 P.3d 952, 958 (Nev. 2013) (recognizing agency).[8] Federal courts have "consistently acknowledged that it is compatible with due process" to exercise jurisdiction over a corporation that would not ordinarily be subject to the court's jurisdiction if that corporation is the alter ego or agent of a corporation over which the court does have jurisdiction. *Iantosca v. Benistar Admin. Servs., Inc.*, 567 Fed. Appx. 1, 4 (1st Cir. 2014) (Souter, Ret. J.) (citations omitted).

In Nevada, an alter-ego relationship exists for jurisdictional purposes where two companies share "such a unity of interest and ownership that in reality no separate entities exist and failure to disregard the separate identities would result in fraud or injustice." *Viega GmbH*, 328 P.3d at 1162 (citing *Am. Tel. & Tel. Co. v. Compagnie Bruxelles Lambert*, 94 F.3d 586, 591 (9th Cir. 1996); *see also Rock Bay*, 298 P.3d at 446 & n 5 (stating a three-part alter-ego test for liability purposes). An agency relationship exists for jurisdictional purposes where "one [company] has the right to control the performance of another [company]" and an in-forum company performs a function that is compatible with, and assists a foreign company in the pursuit of, the foreign company's business. *Viega GmbH*, 328 P.3d at 1159.

The difference between an alter-ego relationship and an agency relationship is critical to the inquiry into personal jurisdiction. If an alter-ego relationship exists, then the subsidiary's corporate separateness is disregarded, *id.* at 1162, and its in-forum jurisdictional contacts flow to the parent corporation. *Id.*; *Doe v. Unocal Corp.*, 248 F.3d 915, 926 (9th Cir. 2001) (per curiam). The Supreme Court

---

[8] NML contends that the court should recognize a third exception: the mere department theory. (*See* Cross Mot. to Compel (#60) at 17:21) (citing *Aerotel, Ltd. v. Sprint Corp.*, 100 F. Supp. 2d 189, 194 (S.D.N.Y. 2000)). The "mere department" theory is a product of New York law. M.F. Corporate Services' relationship with Mossack Fonseca & Co. is governed by Nevada law, which does not appear to have recognized New York's "mere department" theory.

"has not yet addressed whether a foreign corporation may be subjected to a court's general jurisdiction based on the contacts of its in-state subsidiary;" but "several Courts of Appeals have held that a subsidiary's jurisdictional contacts can be imputed to its parent" when "the former is so dominated by the latter as to be its alter ego." *Bauman*, 134 S. Ct. at 759.

An agency relationship entails a different analysis. *Viega GmbH*, 328 P.3d at 1157. An agency relationship maintains the fiction of corporate separateness, *id.*, and permits a court to exercise specific jurisdiction over a foreign corporation by virtue of its relationship with an in-forum agent. *Bauman*, 134 S. Ct. at 759 & n. 13 (citing *Int'l Shoe*, 329 U.S. at 316; *Asahi Metal Indus. Co. v. Superior Court of Cal., Solano Cnty.*, 480 U.S. 102, 112 (1987)). Because an agency relationship maintains the fiction of corporate separateness, an agency relationship may be used to exercise specific jurisdiction over a foreign company. *Bauman*, 134 S. Ct. at 759 & n. 13.

The same principles inform the inquiry into personal jurisdiction over individual officers and employees of a corporation. *See Calder v. Jones*, 465 U.S. 783, 790 (1984); *Davis v. Metro Prod., Inc.*, 885 F.2d 515, 522 (9th Cir. 1989); *Consipio Holding, BV v. Carlberg*, 282 P.3d 751, 754 & n. 2 (Nev. 2012) (en banc). An individual's status as an officer or employee "does not somehow insulate them from jurisdiction." *Calder*, 465 U.S. at 790; *Consipio*, 282 P.3d at 754 & n. 2. Each individual's contacts are assessed individually. *Calder*, 465 U.S. at 790. And if an individual abuses the corporate form, the corporation's contacts may be imputed to the individual. *Davis*, 885 F.2d at 522; *Consipio*, 282 P.3d at 754 & n. 2.

### B.    *Personal Jurisdiction over Mossack Fonseca & Co.*

With this background, the court examines Mossack Fonseca & Co.'s relationship with M.F. Corporate Services, the forum, and the litigation to determine whether the court may compel Mossack Fonseca & Co. to comply with a discovery request under Rule 45. *See Gucci Am.*, 768 F.3d at 141 & n.

20. The court finds that it may.

1. <u>Agency</u>

M.F. Corporate Services is Mossack Fonseca & Co.'s agent because Mossack Fonseca & Co. has

the right to control M.F. Corporate Services and M.F. Corporate Services performs a function that is

compatible with, and assists Mossack Fonseca & Co. in the pursuit of its business. *See Viega GmbH*, 328

P.3d at 1159.

Mossack Fonseca & Co. controls M.F. Corporate Services by, *inter alia*, prohibiting it from

conducting business with other clients and directing its daily business activities. Ms. Amunategui testified

that although her employer is M.F. Corporate Services, her employment contract was signed by Jurgen

Mossack and Ramón Fonseca. Ms. Amunategui also testified that she receives all of her directions from

Iris Vergara in Mossack Fonseca & Co.'s sales department and that Mossack Fonseca & Co. manages

M.F. Corporate Services' human-resources and information-technology matters. Ms. Amunategui also

indicated that she regards Ms. Vergara as M.F. Corporate Services' representative, even though she is an

employee of Mossack Fonseca & Co. and lives and works in Panama.

Mossack Fonseca & Co. and M.F. Corporate Services also share "common features of ownership."

*See Viega GmbH*, 328 P.3d at 1159 (citation omitted). M.F. Corporate Services is owned by Tornbell,

a Panamanian company whose agent is Mossack Fonseca & Co. and whose directors are all Mossack

Fonseca & Co. employees. These facts constitute control for agency purposes. *See id.* (citing *F. Hoffman–*

*La Roche, Ltd. v. Sup. Ct.*, 30 Cal. Rptr. 3d 407, 418–19 (2005)).

NML also demonstrated that M.F. Corporate Services performs a function that is compatible with

and assists Mossack Fonseca & Co. in the pursuit of its business. *See Viega GmbH*, 328 P.3d at 1159. Ms.

Amunategui testified that M.F. Corporate Services assists Mossack Fonseca & Co. with its company-

formation practice. M.F. Corporate Services creates "on the shelf" corporations that are ready to go in

19

"less than 24 hours." When one of Mossack Fonseca & Co.'s clients purchases an "on the shelf" corporation, M.F. Corporate Services begins the process by assembling paperwork and mailing it to the Nevada Secretary of State. When the Nevada Secretary of State is finished, Ms. Amunategui testified that attorneys at Mossack Fonseca & Co. complete the transaction in Panama. Mossack Fonseca & Co.'s own website advertises the services of M.F. Corporate Services as its own.[9] During her deposition, Ms. Amunategui testified that when Mossack Fonseca & Co.'s website advertises services in Nevada, the website is referring to M.F. Corporate Services. (*See* Amunategui Depo. (#90-1) at 117).

These facts demonstrate the existence of an agency relationship. *See Viega GmbH*, 328 P.3d at 1159 (stating that an agency relationship exists "where the local entity . . . essentially exists only to further the business of the foreign entity, and but for the domestic entity's existence, the foreign entity would be performing those functions in the forum itself.") (citation omitted). This relationship permits the court to attribute M.F. Corporate Services' jurisdictional contacts to Mossack Fonseca & Co. and exercise specific jurisdiction over it. *Id.*; *Bauman*, 134 S. Ct. at 759 & n. 13.

Exercising specific jurisdiction over Mossack Fonseca & Co. is appropriate under the Ninth Circuit's three-part test. *See Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 802 (9th Cir. 2004). First, NML demonstrated that Mossack Fonseca & Co. "purposefully directs" its activities towards Nevada by "availing itself of the privilege" of incorporating companies in the state. *See Schwarzenegger*, 374 F.3d at 802. Second, NML's postjudgment discovery requests are "directly related to those activities." (*See generally* Subpoena #14-5); *Schwarzenegger*, 374 F.3d at 802. And third, exercising specific jurisdiction over Mossack Fonseca & Co. is "reasonable and fair" because there is reasonable suspicion to believe that Mossack Fonseca & Co.'s activities further fraud and money laundering. *See NML Capital*

---

[9] *See* MOSSACK & FONSECA, COMPANY FORMATION: NEVADA, USA, *Features of Jurisdiction*, at 3, http://www. mossackfonseca.com/ wp-content/uploads/2014/11/Nevada_features.pdf (last visited March 13, 2015).

20

*Ltd.*, 2014 WL 3898021, at *11; *Schwarzenegger*, 374 F.3d at 802.

    2. Alter Ego

  The court also finds that M.F. Corporate Services is Mossack Fonseca & Co.'s alter ego for jurisdictional purposes because both companies share a unity of interest and ownership and the failure to disregard the separate identities would result in fraud or injustice. *See Viega GmbH*, 328 P.3d at 1162 (citing *Compagnie Bruxelles*, 94 F.3d at 591).

  M.F. Corporate Services and Mossack Fonseca & Co.'s unity of interest is demonstrated by: (1) joint ownership, which exists through Tornbell Associates, Inc., a Panamanian company whose agent is Mossack Fonseca & Co. and whose directors are all Mossack Fonseca & Co. employees; (2) Ms. Amunategui's employment contract, which was signed by Jurgen Mossack and Ramón Fonseca, the founding partners of Mossack Fonseca & Co., and requires Ms. Amunategui to submit to Mossack Fonseca & Co.'s directions and control; and (3) indistinguishable business ventures. As discussed above, M.F. Corporate Services exists to achieve Mossack Fonseca & Co.'s goals and, in so doing, relies on Mossack Fonseca & Co. It provides M.F. Corporate Services with human-resources and information-technology services and advertises M.F. Corporate Services as part of Mossack Fonseca & Co. on its website. (*See* Amunategui Depo. (#90-1) at 117). This demonstrates that M.F. Corporate Services would not exist without Mossack Fonseca & Co. and that M.F. Corporate Services "is so organized and controlled, and its affairs are so conducted that it is in fact a mere instrumentality" of Mossack Fonseca & Co. *Bonanza Hotel Gift Shop, Inc. v. Bonanza No. 2*, 596 P. 2d 227, 229 (Nev. 1979).

  NML also demonstrated that the failure to disregard the companies' separate identities would result in fraud or injustice. As previously stated,

> A company cannot purposefully avail itself of the law's benefits by incorporating in this jurisdiction and then excuse itself from the court's subpoena power by abusing the corporate form. This would allow a corporation to exploit the benefits created by the law

21

without shouldering the concomitant burdens and responsibilities imposed by the law. By incorporating in the State of Nevada, the corporations assented to this court's power to impose a burden under Rule 45(c): the limited but real burden that the United States District Court for the District of Nevada may impose on Nevada residents to testify.

*NML Capital Ltd.*, 2014 WL 3898021, at *11. Maintaining the fiction of M.F. Corporate Services' corporate separateness would result in fraud or injustice because it would shield a reasonable suspicion of fraud and money laundering related to the judgment debtor's assets from further investigation.

The court therefore finds that Mossack Fonseca & Co.'s domination of M.F. Corporate Services extinguishes M.F. Corporate Services' corporate separateness, *see Viega GmbH*, 328 P.3d at 1162, and requires the court to treat M.F. Corporate Services as what it is in reality: Mossack Fonseca & Co. *See Unocal Corp.*, 248 F.3d at 926; *Harris Rutsky & Co. Ins. Servs. v. Bell & Clements Ltd.*, 328 F.3d 1122, 1134 (9th Cir. 2003). This permits the court to exercise general jurisdiction over Mossack Fonseca & Co. because it is "essentially at home" in Nevada by virtue of its domination of M.F. Corporate Services. *See Goodyear*, 131 S. Ct. at 2854.

Exercising jurisdiction over Mossack Fonseca & Co. is consistent with the court's prior order. On August 11, 2014, the court ordered, *inter alia*, the Báez Entities to produce responsive documents and determined that Montoya may be compelled to appear for a deposition in Las Vegas. *See NML Capital Ltd.*, 2014 WL 3898021, at *11–12. The court explained that jurisdiction over Montoya is appropriate because the 123 shell organizations on behalf of whom she spoke purposefully availed themselves of the jurisdiction's benefits and protections by incorporating in Nevada. *Id.* And Montoya reached into the forum to frustrate court process by submitting 123 affidavits that claimed in a conclusory manner that neither she nor the 123 entities are subject to this court's jurisdiction for discovery purposes. *Id.*

It is well established that the refusal to cooperate in discovery may waive a person's right to object to the court exercising personal jurisdiction over her. *See Ins. Corp. of Ireland v. Compagnie des Bauxites*

*de Guinee*, 456 U.S. 694, 696–700 (1982) (finding that a foreign corporation that failed to cooperate in discovery was properly sanctioned by the court's finding that jurisdiction existed over them). Unlike subject-matter jurisdiction, personal jurisdiction is not constrained by Article III. *Id.* at 702–03. Personal jurisdiction "represents a restriction on judicial power not as a matter of sovereignty, but as a matter of individual liberty. Thus, the test for personal jurisdiction requires that 'the maintenance of the suit . . . not offend 'traditional notions of fair play and substantial justice.'" *Id.* (citing *Int'l Shoe*, 326 U.S. at 316).

As demonstrated by the court's previous order, exercising personal jurisdiction over Montoya is consistent with traditional notions of fair play and substantial justice because,

> In the amount of time it takes a jury to return a verdict, a standard wireless device enables a prospective judgment debtor to incorporate shell companies in far-off lands and transfer their assets beyond discovery's reach—all while sitting at counsel's table. As a result, if the judgment creditor returns to court, and requests discoverable information regarding those assets, the Federal Rules of Civil Procedure permit the shell corporations to submit evidence in opposition to a meritorious motion to compel—all while purporting to be beyond the court's subpoena power. This frustrates court process and weakens the judicial power bestowed by the Constitution, which exists to finalize cases and controversies.

*NML Capital Ltd.*, 2014 WL 3898021, at *12.

## III.   Whether NML's Subpoenas are Unduly Burdensome

The parties raise a final issue: whether NML's subpoenas are unduly burdensome. M.F. Corporate Services and Ms. Amunategui contend that the subpoenas are unduly burdensome because (1) the subpoenas place an undue burden and expense on M.F. Corporate Services and Ms. Amunategui, (2) the subpoenas do not permit a reasonable time to comply, and (3) the subpoenas demand personal and confidential material. (*See* Mot. to Quash #14).[10]

---

[10] The parties' numerous stipulations to extend have rendered the argument that the subpoenas do not permit a reasonable time to comply moot.

## A.    *Legal Standard*

Rule 69(a)(2) permits a judgment creditor to obtain discovery "as provided in these rules" or "by the procedure of the state where the court is located." Nevada Rule of Civil Procedure 26(b)(1) permits a judgment creditor to obtain discovery "regarding any matter" and this "relevant to the subject matter involved in the pending action." This rule is broader than the corresponding federal rule. *See* FED. R. CIV. P. 26(b)(1), Advisory Comm. Notes (2000) (explaining an amendment to Rule 26(b)(1) that narrows the scope of discovery).

Under Federal Rule 26(b)(1), subpoenas requesting "all documents" are routinely deemed unduly burdensome. *See, e.g.*, *Mattel, Inc. v. Walking Mountain Prods.*, 353 F.3d 792, 813–14 (9th Cir. 2003). In *Rock Bay*, however, the Nevada Supreme Court reached the opposition conclusion and affirmed the lower court's determination that a subpoena requesting "all records related to the judgment debtors" was not unduly burdensome. *Rock Bay*, 298 P.3d at 444, 447.

*Rock Bay* permitted broad discovery of the nonparty's assets because (1) there was a reasonable suspicion that examination of the nonparty's records could lead to the discovery of the judgment debtor's concealed assets, (2) "the need of a judgment creditor to examine a nonparty's financial records outweighs the nonparty's privacy interests," and (3) "the judgment creditor is not a competitor of the nonparty." *Id.* at 447 (citing *Falicia v. Advanced Tenant Servs., Inc.*, 235 F.R.D. 5, 9–10 (D. D.C. 2006)).

## B.    *Whether NML's Subpoenas are Unduly Burdensome*

The Amunategui Subpoena (#14-2) and MF Nevada Subpoena (#14-5) seek, *inter alia*, "[a]ll documents relating to funds or other property transferred either by one of the following entities to another person, or to one of the following [137] entities by another person, since January 1, 2010." (*See, e.g.*, Doc. #14-2 at 9–12). The 137 entities are the 123 Báez Entities and fourteen additional companies: (1) Westley House, LLC, (2) Eyden Group, LLC, (3) RGS Steel LLC, (4) Itelsa Services, LLC, (5) GD Soccer

24

Management LLC, (6) Cambridge House LLC, (7) Exeter House, LLC, (8) Redford House LLC, (9) T.H.I. - Tower House International LLC, (10) M.P.I. - Mayward Properties International LLC, (11) Fairland International LLC, (12) Rochester International LLC, (13) Westfield International LLC, and (14) Ariona Company LLC. (*Compare id. with* Appx. A (#1) at 19–21).

M.F. Corporate Services' Motion to Quash is granted with regard to the fourteen additional companies because NML has not demonstrated reasonable suspicion to doubt the good faith of asset transfers between these fourteen entities and Argentina. *See Rock Bay*, 298 P.3d at 443. NML has demonstrated reasonable suspicion with regard to the Báez Entities, *see NML Capital Ltd*., 2014 WL 3898021, at *5, Val de Loire, *see supra* § I at pp. 9–15, and M.F. Corporate Services.[11]

The court is unpersuaded by the remaining argument in M.F. Corporate Services' Motion to Quash. It contends that compliance will subject M.F. Corporate Services to considerable expenses and attorney's fees. (Doc. #14 at 7 ¶ 16). NML has repeatedly stated that it will mitigate the costs of complying with its discovery requests. *See NML Capital Ltd.*, 2014 WL 3898021, at *12.

M.F. Corporate Services also argues that compliance creates an undue burden because "there is . . . no limit to the universe of documents NML as requested." (Doc. #14 at 8 ¶ 17). Neither Rule 26(b)(2) nor 26(c) permit a court to limit discovery that is relevant to a claim or defense because, as the M.F. Corporate Services suggests, there is too much responsive information. *In re MGM Mirage Sec. Litig*., No. 2:09-CV-1558-GMN, 2014 WL 6675732, at *4 (D. Nev. Nov. 25, 2014).

---

[11] M.F. Corporate Services contends that the subpoenas place an undue burden on M.F. Corporate Services and Ms. Amunategui because "NML has not alleged that there is any connection between MF Nevada and Ms. Amunategui and the target of their investigation, Lazaro Báez." (Doc. #14 at 9 ¶ 21). This argument is moot. The court has already concluded that there is reasonable suspicion to believe that a connection exists. *NML Capital Ltd.*, 2014 WL 3898021, at *12.

In *Rock Bay*, the judgment creditor subpoenaed a nonparty and requested "all records related to the judgment debtors." *Rock Bay*, 298 P.3d at 444, 447. The Nevada Supreme Court found that the subpoena was not unduly burdensome because (1) there was a reasonable suspicion that examination of the nonparty's records could lead to the discovery of the judgment debtor's concealed assets, (2) "the need of a judgment creditor to examine a nonparty's financial records outweighs the nonparty's privacy interests," and (3) "the judgment creditor is not a competitor of the nonparty." *Id.* at 447 (citing *Falicia v. Advanced Tenant Servs., Inc.*, 235 F.R.D. 5, 9–10 (D. D.C. 2006)).

Analogous circumstances exist here. NML demonstrated reasonable suspicion that examination of M.F. Corporate Services' records could lead to the discovery of the Argentina's assets. *NML Capital Ltd.*, 2014 WL 3898021, at *12 (granting NML's Motion to Compel). The court has also concluded that NML's need to examine M.F. Corporate Services' records outweighs its privacy interests. *See NML Capital Ltd. v. Rep. of Argentina*, No. 2:14–cv–492–RFB–VCF, 2015 WL 727924, at *7–9 (D. Nev. Feb. 19, 2015) (granting Mr. Lanata's Motion to Unseal). There is also no question that NML and M.F. Corporate Services are not competitors.

ACCORDINGLY, and for good cause shown,

IT IS ORDERED that Val de Loire's Motion to Quash (#1) is DENIED.

IT IS FURTHER ORDERED that NML's Counter Motion to Compel (#10) is GRANTED.

IT IS FURTHER ORDERED that M.F. Corporate Services' Motion to Quash (#14) is GRANTED in part and DENIED in part.

IT IS FURTHER ORDERED that NML's Counter Motion to Compel (#60) is GRANTED in part and DENIED in part.

IT IS FURTHER ORDERED that each party who filed a sealed version of Ms. Amunategui's deposition transcript must refile a redacted version of the transcript in accordance with the court's prior

order by March 23, 2015.

IT IS FURTHER ORDERED that NML and counsel for UBS must meet and confer regarding UBS's letter. If the parties cannot reach an agreement by March 23, 2015, UBS must file a Motion to Seal. Oppositions, if any, are due by March 30, 2015, and replies are due by April 3, 2015.

IT IS FURTHER ORDERED that the parties meet and confer to set a schedule for producing documents in compliance with this order. The schedule must be filed with the court by April 20, 2015.

IT IS SO ORDERED.

DATED this 16th day of March, 2015.


CAM FERENBACH
UNITED STATES MAGISTRATE JUDGE